No. 98-349

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 10

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MICHAEL LEE KEYS,

Defendant and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Katherine R. Curtis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Daniel R. Wilson; Daniel R. Wilson, P.C.; Kalispell, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; C. Mark Fowler

Assistant Attorney General; Helena, Montana

Thomas J. Esch, Flathead County Attorney; Kalispell, Montana

Submitted on Briefs: November 19, 1998

Decided: January 25, 1999

Filed:

No

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

**¶1. On October 7, 1996, Michael Lee Keys was charged by information in the Eleventh Judicial District Court, Flathead County, with felony theft in violation of § 45-6-301(1)(c), MCA. Keys pled not guilty on October 17, 1996. On June 9, 1997, Keys entered an *Alford* plea pursuant to a plea agreement. On June 26, 1997, the District Court ordered that Keys' sentence be deferred for six years, two years longer than Keys had agreed to in the plea agreement. On July 3, 1997, Keys filed a motion to withdraw his guilty plea. The District Court denied the motion on February 26, 1998. Keys filed a notice of appeal on April 21, 1998. We affirm the judgment of the District Court.**

**¶2. The issue raised on appeal is whether the District Court abused its discretion when it denied Keys' motion to withdraw his guilty plea.**

FACTUAL BACKGROUND

**¶3. In 1994, Michael Lee Keys loaned $550 to Lance Vitt. By late 1995, Vitt had not returned Keys' money, so Keys agreed with Vitt to accept a motorcycle as collateral for the loan. Keys later needed money and so asked for and received Vitt's permission to pawn the motorcycle. Keys pawned the motorcycle to his father and left it at his father's residence near Kalispell. Shortly before the felony theft charge was filed against Keys, the sheriff's department received a complaint regarding the motorcycle. According to the information provided to the sheriff, the motorcycle actually belonged to Quentin Vitt, Lance Vitt's father.**

**¶4. On October 7, 1996, the Flathead County Attorney charged Keys with the offense of theft, a felony, and charged Keys' father with the same offense. Keys appeared for arraignment on October 17, 1996, at which time he entered a plea of not guilty.**

**¶5. Keys negotiated a settlement whereby he would enter an *Alford* plea to the offense of felony theft. The plea agreement provided that in exchange for Keys' *Alford* plea, the State would recommend that the imposition of his sentence be deferred for a**

period of four years, and further provided that the State would dismiss the related criminal charge against Keys' father.

¶6. At the change of plea hearing, the District Court tried to determine whether Keys understood that the court was not a party to the plea agreement. Keys first responded that he did not understand what the judge was saying. He then explained that he had agreed to plead guilty in order to receive the sentence contained in the plea agreement, or in Keys' words "for what's on that paper." Although Keys expressed some difficulty understanding the court, the District Court was assured that Keys finally understood that it was not bound to follow the State's sentencing recommendation. After a lengthy question and answer period, during which Keys said that he did not understand that the court is not bound by the plea agreement, the court asked "do you, now?" and Keys replied "yeah." The District Court then asked Keys if he still wanted to go forward with the agreement, and Keys said "yes."

¶7. When the District Court announced Keys' sentence, it declined to follow the plea agreement by deferring imposition of the sentence for six years, rather than four years. Seven days later, Keys filed a motion to withdraw his guilty plea, urging the District Court to find that the plea was not knowingly and intelligently made. The State opposed the motion but conceded that the motion was timely.

¶8. Keys' attorney later testified at the hearing on the motion to withdraw Keys' guilty plea that, in his opinion, Keys never really understood that the District Court was not bound by the plea agreement. Keys' attorney testified that he assumed Keys would read the agreement himself and formulate his own questions about it before pleading guilty, but that he did not know that Keys could not read. Keys later explained to the District Court that he pled guilty out of a sense of loyalty to his father.

¶9. The District Court entered an order which denied Keys' motion to withdraw his guilty plea. The court determined that the timeliness of Keys' motion was highly questionable, that there was an adequate interrogation of Keys regarding his understanding and consequences of the guilty plea, and that Keys had signed a plea agreement which constituted a waiver of his rights.

## STANDARD OF REVIEW

¶10. The issue raised on appeal is whether the District Court abused its discretion when it denied Keys' motion to withdraw his guilty plea.

¶11. Pursuant to § 46-16-105(2), MCA, a court may for good cause permit the plea of guilty to be withdrawn and a plea of not guilty substituted. We review a district court's discretion to grant or deny a motion for the withdrawal of a guilty plea for an abuse of discretion. *See State v. Bowley* (1997), 282 Mont. 298, 304, 938 P.2d 592, 595. To determine whether good cause existed and whether there was an abuse of discretion, we consider the following factors: (1) the adequacy of the district court's interrogation at the time of the plea regarding the defendant's understanding of the consequences of the plea; (2) the fact that the plea was the result of a plea bargain in which the guilty plea was given in exchange for dismissal of another charge; and (3) the promptness with which the defendant attempted to withdraw the plea. *See State v. Johnson* (1995), 274 Mont. 124, 127-28, 907 P.2d 150, 152.

¶12. The test for determining the validity of a guilty plea is whether the plea represents a "voluntary, knowing, and intelligent choice among the alternative courses of action open to the defendant." *State v. Radi* (1991), 250 Mont. 155, 159, 818 P.2d 1203, 1206 (quoting *North Carolina v. Alford* (1970), 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162). This Court will deem a guilty plea involuntary when it appears that the defendant was laboring under such a strong inducement, fundamental mistake, or serious mental condition that the possibility exists he may have pled guilty to a crime of which he is innocent. *See State v. Miller* (1991), 248 Mont. 194, 197, 810 P.2d 308, 310. If there is any doubt that a guilty plea was not voluntarily or intelligently made, the doubt must be resolved in favor of the defendant. *See State v. Enoch* (1994), 269 Mont. 8, 18, 887 P.2d 175, 181.

DISCUSSION

A. The adequacy of the District Court's interrogation at the time of the plea

¶13. Keys maintains that he did not understand that by signing the plea agreement and entering a plea of guilty, the District Court was not bound by the plea agreement. Keys claims that his inability to understand that a plea agreement contains only a sentence recommendation and not a sentence guarantee is due to the fact that he cannot read and because his attorney never properly explained the agreement to him. He further contends that no matter how many times he was told

about the significance of the plea agreement and the District Court's policy regarding plea agreements, he was never made to completely understand. Keys, however, admits that he was told no less than ten times that the District Court was not bound by the plea agreement. The first instance was by the District Court at Keys' arraignment, the second was by Keys' own attorney, the third was by the written plea agreement signed by Keys three days before he pled guilty, and the other seven instances were by the District Court at the change of plea hearing.

¶14. Pursuant to § 46-12-201(1), MCA, the District Court has a duty to determine Keys' understanding of the consequences of this guilty plea *before the court accepts the guilty plea*. The statute does not require that the District Court guarantee that Keys continues to retain his understanding after the plea hearing ends and the court renders a sentence. The issue here therefore is whether Keys understood the consequences of his guilty plea *when he entered his guilty plea*.

¶15. Based on our review of the record, we conclude that the District Court did not err when it found that Keys understood its policy regarding plea agreements and entered his plea voluntarily and knowingly. At the change of plea hearing, the District Court referred to the plea agreement provision regarding waiver of rights in which Keys acknowledged "I am not suffering from any mental disease or defect . . . nor am I acting under the influence of alcohol, drugs, or prescription medicine." Keys told the District Court that he was sober and clearheaded and that nothing impeded his judgment. Yet, without offering any evidence, Keys now claims that he suffered from a fundamental mistake about the District Court's policy regarding plea agreements. We disagree with Keys that the District Court should have known that he was allegedly suffering from a disability at the time of the plea hearing. Moreover, at the end of a lengthy colloquy between the District Court and Keys regarding whether Keys understood that the District Court is not bound by the plea agreement, the following dialogue occurred:

KEYS: I'll say I didn't understand that part.


THE COURT: Okay. Do you now?


KEYS: Yeah.

No

THE COURT: Okay. Do you still want to go forward with this agreement?

KEYS: Yeah.

**¶16. We conclude that the District Court did not abuse its discretion by accepting the representations of a sober, clear-minded person who, while showing some difficulties understanding the proceedings, expressed to the District Court's satisfaction a clear statement of understanding at the time the court accepted his plea. The District Court took great pains to resolve Keys' difficulties, and the record establishes that Keys stated that he did in fact understand. The District Court is entitled to rely on Keys' oral and written representations and, absent some indication of a disability at the time of the hearing, accept his plea as voluntary and intelligent.**

B. The fact that Keys' *Alford* plea was the result of a plea bargain

**¶17. Keys claims that the fact that he pled guilty pursuant to a plea bargain should not militate against the withdrawal of his plea. He urges this Court to disregard the State's agreement to dismiss the charges against his father as consideration because Keys claims he did not directly benefit from the dismissal. Contrary to Keys' claim, however, the State's dismissal of charges against his father did directly benefit Keys. Keys prevented the potential loss of his father's liberty and, as Keys stated, he pled guilty out of loyalty to his father.**

**¶18. The plea bargain agreement between Keys and the State is a contract which is subject to contract law standards. *See State v. Butler* (1995), 272 Mont. 286, 291, 900 P.2d 908, 911. Thus, Keys must show that there existed no consideration to support the plea agreement in order to invalidate it. *See Nitzel v. Wickman* (1997), 283 Mont. 304, 309, 940 P.2d 451, 454. In this case, there was consideration in the form of the State's promises of benefits to Keys, including the dismissal of charges against his father. This was both a benefit to Keys and a detriment to the State. The fact that the State forewent its prosecution of Keys' father creates valid consideration for the contract. The State had a right to pursue its charge against Keys' father. By**

dismissing the case, the State suffered the deprivation of a right which the law did not require. *See* § 28-2-801, MCA. Valid contract consideration includes the promise to refrain from suing or pressing a claim. *See Devon Oil & Gas Co. v. Ayers* (1985), 218 Mont. 223, 227, 707 P.2d 523, 526. Moreover, the State fulfilled promises to Keys other than refraining from prosecuting his father, namely the State promised a deferral of Keys' own sentence. Finally, after the State dismissed the case against Keys' father pursuant to the plea agreement, and the District Court rendered the sentence, Keys told his attorney, "I didn't get the deal I was supposed to get." The record therefore refutes Keys' assertion that the State's promise to dismiss his father's charges was the sole inducement for him to plead guilty. Keys clearly understood the benefit he would receive by accepting the plea agreement and by entering an *Alford* plea.

¶19. We have held that we will not assist a defendant in escaping the obligations of his plea agreement after he has received its benefits. *See State v. Nance* (1947), 120 Mont. 152, 166, 184 P.2d 554, 561. We conclude that Keys did benefit from the plea agreement with the State and has failed to invalidate it by establishing that no consideration existed.

C. The promptness with which Keys attempted to withdraw his plea

¶20. In a determination of whether a defendant should be permitted to withdraw a guilty plea, we finally consider how promptly the defendant has moved to withdraw the plea. *See State v. Bowley* (1997), 282 Mont, 298, 304, 938 P.2d 592, 595. Because the State conceded that Keys' motion was timely made, however, promptness is not in dispute and therefore we need not address this issue on appeal.

¶21. Upon a review of the record, we conclude that the District Court did not abuse its discretion by denying Keys' motion to withdraw his guilty plea because (1) the District Court's interrogation of Keys provided him with an adequate understanding of the effect of the plea agreement; (2) Keys' plea bargain agreement which he struck with the State is valid and did benefit Keys; and (3) although Keys' request to withdraw his guilty plea was timely, promptness cannot outweigh all of the evidence which weighs in favor of the District Court's decision when analyzing the other factors. Keys entered his guilty plea voluntarily and intelligently and there exists no good cause to now permit Keys to withdraw it.



**¶22. The judgment of the District Court is affirmed.**

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

Justice W. William Leaphart, dissenting.

**¶23. I dissent. If there is any doubt that a guilty plea was not voluntarily or intelligently made, the doubt must be resolved in favor of the defendant. *See* State v. Enoch (1994), 269 Mont. 8, 18, 887 P.2d 175, 181 (citations omitted). Given the fact that this defendant could not read and given his obvious state of confusion as to the role of the court in accepting a plea pursuant to a plea agreement, it is apparent to me that there was doubt that Keys' plea was voluntarily and intelligently made.**

**¶24. In his colloquy with the court at the change of plea hearing, Keys made it very clear that he understood that he had an agreement that his sentence would be deferred for a period of four years and that the State would dismiss the related charged against Keys' father. Keys stated, "[w]ell, the reason I'm signing that, pleading guilty, because that's what I agreed to do, to say I'm guilty for what's on**

that paper." When advised by the court that the Judge can "change" the sentence from what was agreed on, Keys responded "[w]hy is the paper made up? . . . So the paper don't really mean anything?" Again, the court explained that the agreement was between Keys and the State and that the State was bound to make the agreed upon recommendation but the court was not bound to follow that recommendation. Again, Keys expressed confusion: "Well, if the paper was good, the one I signed, ain't that the way it should be? Or, I mean, if you don't agree to it, the paper aint' no good?" The court then continued in its effort to disabuse him of his belief that the agreement guaranteed him a specific sentence. Finally, Keys indicated that he understood what the court was saying and that he wanted to proceed to change his plea. His counsel then proceeded to question him and took great pains to point out that, unless something unexpected came up in the presentence investigation, there was no reason to think that the court would not go along with the agreement. More importantly however, the court, on two subsequent occasions in the discussion, reaffirmed Keys' understanding that the court was in agreement with the agreed upon four-year deferment. The court asked Keys whether he understood what a deferred sentence was. Keys indicated that if he did what he was told and stayed out of trouble, "then it's off my record." To which the court replied: "Exactly. And you understood that you'll be on probation for four years?" Shortly thereafter, Keys indicated that the agreement was a good deal because, if he complied, everything would be dropped. The court, in confirming his understanding, again specifically referenced the agreed upon four-year deferment: "Because, even though you have to abide by the rules and all that stuff for four years, at the end of that, assuming that you have done what you're supposed to, that's important to you?"

¶25. The court did all that it could to fully explain to Keys that the court is not a party to the plea agreement. Nonetheless, the fact remains that the court's role in accepting a change of plea pursuant to a plea agreement is confusing even to those schooled in the law. In reviewing the record before us, I am convinced that Keys, who was unable to read the controlling statutes or the plea agreement itself, but who had a layman's understanding of an "agreement," was confused by the assurances that there was no reason to think that the court would not go along with the agreement, and by the court's concluding references to the agreed upon four-year deferment. I would resolve the doubt in favor of allowing Keys to withdraw his plea of guilty.

/S/ W. WILLIAM LEAPHART

Justices Terry N. Trieweiler and William E. Hunt, Sr., join in the foregoing dissent of Justice W. William Leaphart.

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER